**Stephen Lyle McDONOUGH,
Plaintiff and Appellee,**

v.

**Margaret Susan MURPHY f/k/a
Margaret Susan McDonough,
Defendant and Appellant.**

Civ. No. 950018.

Supreme Court of North Dakota.

Oct. 31, 1995.

James R. Brothers (argued) of Wold Johnson, P.C., Fargo, for plaintiff and appellee.

Ralph F. Carter (argued) of Moosbrugger, Ohlsen, Dvorak & Carter, Grand Forks, for defendant and appellant.

MESCHKE, Justice.

Margaret Susan Murphy appeals from an amended decree transferring custody of her son, Shaun, to his father, Stephen Lyle McDonough, and ordering Murphy to pay child support. We affirm.

In January 1986, McDonough and Murphy were divorced in Traill County. The divorce decree placed custody of four-year-old Shaun with Murphy, and set reasonable visitation for McDonough. McDonough moved to Bismarck and remarried. He and his present wife, Denise, have two children. Murphy moved to Grand Forks and remarried. She and her present husband, Jerry, have one child. Several amended decrees and appeals have occurred. *See McDonough v. McDonough,* 458 N.W.2d 344 (N.D.Ct.App.1990); *McDonough v. McDonough,* 395 N.W.2d 149 (N.D.1986). According to the trial court, the "litigious nature" of these parents led to "one of the more specific visitation schedules ever promulgated by this Court."

In July 1993, McDonough sought a change of custody because, he alleged, Shaun was becoming increasingly unhappy; his custodial home had become unstable; he expressed a preference to live with McDonough; a psychological evaluation supported the change; and Shaun had developed a good relationship with McDonough's extended family in Bismarck. During the guardian ad litem's investigation, Murphy learned that her husband, a major in the United States Air Force, would be transferred to Tucson, Arizona. In July 1994, Murphy moved the court for permission to change Shaun's residence to Arizona.

After completing his investigation, the guardian ad litem recommended that Shaun be placed in McDonough's custody. McDonough's expert psychologist believed a change of custody would be beneficial to Shaun because Shaun was suffering from "dysthymic disorder" in his present situation. Murphy's expert psychologist detected no need for a change, finding nothing "particularly wrong with the position that [Shaun] was in at this point in time." Shaun, then age 13, expressed a strong preference to live with McDonough.

The trial court granted McDonough's motion for change of custody, finding that there had been a significant change in circumstances necessitating a custodial modification, and that Shaun's interests would be best served by transferring custody from Murphy to McDonough, with reasonable visitation for Murphy. The court rejected Murphy's motion to change Shaun's residence and ordered

Murphy to pay $250 per month in child support for Shaun. Murphy appealed.

## I

To modify an original custodial placement, the trial court must apply a two-step analysis. *Van Dyke v. Van Dyke,* 538 N.W.2d 197, 201 (N.D.1995). The court must first determine whether there has been a significant change in circumstances since the original placement. *Klose v. Klose,* 524 N.W.2d 94, 95 (N.D.1994). If there has, the court must further determine whether that change compels, in the child's best interests, a change of custody. *Barstad v. Barstad,* 499 N.W.2d 584, 587 (N.D.1993). The parent seeking to modify custody has the burden of showing both that a circumstance changed significantly and that this change so adversely affected the child that a custodial change is required. *Gould v. Miller,* 488 N.W.2d 42, 43 (N.D.1992). Changed circumstances must be new facts that were unknown at the time of the prior custodial decree. *Leppert v. Leppert,* 519 N.W.2d 287, 292 (N.D.1994). As we explained in *Alvarez v. Carlson,* 524 N.W.2d 584, 589–590 (N.D.1994), there is a doctrinal aversion to changing the custody of a happy child who has been living with one parent for a substantial time, and thus close calls should be resolved in favor of continuing an existing custodial placement.

A trial court's decision to modify custody is a finding of fact subject to the clearly erroneous standard of review. *Blotske v. Leidholm,* 487 N.W.2d 607, 609–610 (N.D.1992). We have often explained, again recently in *Reinecke v. Griffeth,* 533 N.W.2d 695, 698 (N.D.1995), that a finding is clearly erroneous under N.D.R.Civ.P. 52(a) only if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, on the entire evidence, we are left with a definite and firm conviction that a mistake has been made.

The trial court ruled there had been a significant change in circumstances since the last custody order that required a change of custody. That finding is not clearly erroneous.

The trial court reasoned that several changes combined to cause the transfer of custody. The court found that Shaun, through the guardian ad litem, expressed a preference to live with McDonough and that Shaun's preference was "made as knowledgeably as can be made by a 13–year old." The guardian ad litem interviewed all interested parties, the psychologists, and Shaun's teachers and school counselor. The guardian ad litem reported that Shaun has not shown disciplinary or behavioral problems in school at any grade level, has performed very well academically, and has been described by school personnel as "very responsible," "mature," and "a well adjusted young man displaying no problem signs . . . ." The guardian ad litem reported Shaun has clearly expressed his desire to live with his father to these people, his father, and his mother, as well as to a psychologist. The guardian ad litem said Shaun described his relationship with his stepfather "as not being a good one or distant," that his stepfather had "gotten between his relationship with his mother," and that Shaun "feels he . . . is closer to his dad than he is with his mom." Recognizing that Shaun "is on the low end of the age scale for having significant input in the decision of which parent to live with as primary custodial parent," the guardian ad litem recommended that Shaun's preference be given weight under the circumstances.

The court recognized that McDonough "has been significantly involved in the care and rearing of Shaun," and that Shaun "interact[s] more favorably" with McDonough's family than with Murphy's family. The court ruled "[t]he strong preference expressed by Shaun to reside with his father is significant and is a factor that cannot be overlooked . . . ."

The trial court also relied on the Murphys' impending move to Arizona. The Murphys have no relatives there. The guardian ad litem realized that Shaun was only two or three years away from being given "major input" into his custodial placement. Because Murphys were leaving Grand Forks, requiring an inevitable change of schools and residence for Shaun, the guardian ad litem viewed now a "convenient time" to make the

change of custody rather than in the near future if Shaun continued his strong desire to live with his father.

■■■ A custodial parent's move to another state does not, by itself, compel a change of custody. *Barstad,* 499 N.W.2d at 587. So too, a child's stated preference to live with a noncustodial parent, unless coupled with other relevant reasons, does not alone constitute a significant change of circumstances. *Alvarez,* 524 N.W.2d at 590. Although a child's preference is not as important in determining whether there has been a significant change of circumstances as it is in determining the best interests of the child under NDCC 14–09–06.2(1)(i), it is a factor that can be considered by the trial court for both steps of the analysis. *Klose,* 524 N.W.2d at 96. However, a child's preference to live with a noncustodial parent must be viewed with caution because it may be motivated by goals and ambitions that undermine the significance of that preference and are actually detrimental to the child's best interests. *Alvarez,* 524 N.W.2d at 590. Here, there is more than the Murphys' move to Arizona and Shaun's stated preference to live with his father.

The trial court found that "it is in the best interests of Shaun's mental and psychological stability that this change of custody be granted.... [I]f this change were not granted, Shaun's future psychological and emotional well-being would be adversely affected." Contrary to Murphy's assertion, sufficient evidence supports this finding.

At McDonough's request, Dr. Leland H. Lipp examined Shaun in April 1992 and diagnosed him as having an "adjustment disorder with depressed mood." Lipp described this diagnosis as reflecting that an "individual is basically normal, but they're having an emotional reaction to a specific environmental set of situations." Lipp recommended no attempt to change custody at that time because Shaun was "coping adequately" and "was not so depressed that ... it was going to be a long-term negative effect on his mental health...." Lipp again recommended no attempt to change custody in his January 1993 evaluation of Shaun. Although Shaun expressed fears of his stepfather, concerns about leaving the state, and his desires to live with his father and to remain in the state so his father would be more accessible to him, Lipp concluded Shaun "was coping and getting along adequately enough...."

But Lipp became concerned when he examined Shaun in April 1993 because Shaun "started doing some things that were quite out of character for him." Shaun told Lipp that "he had tried to run away from home on two occasions" in an effort "to send a signal to his mother and stepfather that ... he was not getting his emotional needs met...." According to Lipp, Shaun was expressing "themes of depression, of fear of his stepfather, rejection, continued thoughts of running away, to get away from the situation, and the theme of wanting to reunite with his father." Lipp diagnosed Shaun as suffering from "dysthymic disorder," a more chronic form of depression.

Lipp opined that it would be "in the best mental health interests" of Shaun to be allowed to live with McDonough. Lipp explained:

A. ... I think that Shaun has become a demoralized kid and I think this has had an effect upon his emotional development and will continue to have an effect on his emotional development.

Q. Can you predict what the effect on his emotional development would likely be if he were not allowed to live where he wishes to live?

A. I think it would go one of two ways. I think either he would slip back into periodic depression, demoralization is kind of a chronic low grade depression, you don't meet the criteria, according to the standards, but emotionally it's kind of like you're kind of down a lot, and I think he would either slip into more of a clinical depression, like he had when I first saw him, or, alternatively, he would start acting out more as he got further into his adolescence, where that type of behavior is more socially acceptable and more frequently occurring.

So I think it would probably go one of two ways.

Q. Neither of those sounds very good to me, though?

A. That's correct. That's why I made that recommendation.

■ Relying on *Weber v. Weber*, 512 N.W.2d 723 (N.D.1994), Murphy asserts that Lipp's analysis is tainted and unethical because he recommended a custodial placement without interviewing both sets of parents. However, unlike the psychologist in *Weber*, Lipp was not subjected to a disciplinary reprimand by the Board of Psychologist Examiners for his actions in this case. Moreover, we concluded in *Weber* that the frailty of the psychologist's testimony, there apparent to the trial court, went to the weight to be accorded her opinion rather than to its admissibility. Here, too, the perceived ethical problems with Lipp's testimony was brought to the attention of the trial court, who understood that neither of the psychologists' reports "involves consultation and evaluation of all parties." In any event, we read the trial court's decision as giving credence to Lipp's psychological assessment of Shaun's unhappy circumstances, rather than to Lipp's recommendation about custodial placement.

■ Murphy asserts that McDonough purposely frustrated her parent-child relationship with Shaun by having Shaun evaluated by Lipp without her knowledge or consent in violation of the divorce decree. In *Von Bank v. Von Bank*, 443 N.W.2d 618, 619 (N.D.1989), we upheld a change of custody from the mother to the father, based in part on a trial court's finding that, by not informing the father about the child's medical and dental health, the mother sought to frustrate the father's parental relationship with the child "to an extent that adversely affected" the child. Here, the guardian ad litem and the trial court both worried about McDonough's unilateral arrangement of Lipp's psychological evaluations of Shaun. The guardian ad litem termed McDonough's explanation for his actions as "lame," but saw no purpose in punishing Shaun for his father's "indiscretion." The trial court, too, recognized that McDonough "has manipulated facts and circumstances to place himself in a position most favorable to the Court." Still, unlike the trial court in *Von Bank*, this trial court did not go further and find that McDonough's actions were taken in an effort to frustrate Murphy's parent-child relationship to an extent harmful to Shaun. While we share the trial court's misgivings about McDonough's conduct, we are in no position to make the further factual finding sought by Murphy, but refused by the trial court.

The trial court found that both parties "possess all of the required parenting skills, motivation, disposition, and moral fitness to provide for the nurture and care of" Shaun, and that the court would, under "normal" circumstances, "have no difficulty or hesitation placing Shaun with either of the parties." But the circumstances were not "normal" in this case. In its opinion, the court explained:

> This Court is aware of the caselaw, which indicates that the preference of a child is only one factor to be considered and although this Court has placed significant weight upon the preference of the minor child, the Court's decision is based upon many other factors. The Court has an abiding conviction that it is truly in the interest of the minor child's mental and psychological stability that the change be granted. The Court has a firm conviction that given the litigious nature of the parties to this matter, that i[f] a change were not granted it would adversely affect the[ ] future psychological and emotional well being of the minor child.

■ Only when the reasons for changing custody substantially outweigh the child's stability with the custodial parent should a change be made. *Hagel v. Hagel*, 512 N.W.2d 465, 468 (N.D.1994). The trial court's findings, that Shaun's psychological and emotional health substantially outweigh the stability with his custodial parent and thus compel the change of custody, are not clearly erroneous. The trial court did not misapply the law in granting McDonough's motion to transfer custody of Shaun.

■ Nor did the trial court err in summarily rejecting Murphy's motion to change Shaun's residence to Arizona because it was no longer necessary to reach the merits of that motion. Because a motion for change of

custody and a countermotion to change the residence of the child are inseparable and intermingled, *see Thomas v. Thomas*, 446 N.W.2d 433, 436 (N.D.1989), the trial court correctly concluded that when one of the competing motions is granted, the other is effectively denied.

## II

■ Murphy argues that the trial court erred in computing her child support obligation on "in-kind income" because, effective January 1, 1995, the child support guidelines no longer permit calculation of a child support obligation on this basis. *See* NDAC 75–02–04.1–08, as amended (1995). She asserts that the income of a noncustodial parent who, like herself, does not work outside the home should now be calculated for child support purposes by imputing income based on earning capacity. *See* NDAC 75–02–04.1–07 (1995). But the trial court's decision was rendered before the effective date of the new guidelines. *See Smith v. Smith*, 538 N.W.2d 222, 225 n. 2 (N.D.1995). If Murphy believes the new guidelines are more favorable to her, she will be entitled after remand to move for modification of her support obligation since the last support order was entered more than one year ago on September 2, 1994. *See* NDCC 14–09–08.4(3). The trial court was not wrong in applying the guidelines as they then existed.

■ Murphy also argues there was insufficient evidence to support the trial court's computation of her in-kind income as $1,000 per month to arrive at a child support obligation of $250 per month. A trial court's determination on child support will be affirmed unless it is clearly erroneous. *Reinecke*, 533 N.W.2d at 700. Someone challenging a finding of fact on appeal bears the burden of demonstrating it is clearly erroneous. *Schmidkunz v. Schmidkunz*, 529 N.W.2d 857, 860 (N.D.1995). We conclude that Murphy has not met her burden of demonstrating that the trial court's findings on child support are clearly erroneous.

The amended decree is affirmed.

VANDE WALLE, C.J., and SANDSTROM, NEUMANN and LEVINE, JJ., concur.