Stout v. Stout, 1997 ND 61, 560 N.W.2d 903|N.D. Supreme Court|
Stout v. Stout, 1997 ND 61, 560 N.W.2d 903
[Go to Documents]
Filed Apr. 1, 1997
Concur and Dissent and Dissent filed.
IN THE SUPREME COURT
STATE OF NORTH DAKOTA
1997 ND 61
James R. Stout, Jr., Plaintiff and Appellee
v.
Julene L. Stout, Defendant and Appellant
Civil No. 960150
Appeal from the District Court for Grand Forks County, Northeast Central Judicial District, the Honorable Bruce E. Bohlman, Judge.
REVERSED AND REMANDED.
Opinion of the Court by Maring, Justice.
Shirley A. Dvorak (argued), Moosbrugger, Dvorak & Carter, 219 South 3rd Street, P.O. Box 5159, Grand Forks, N.D. 58206-5159, for defendant and appellant.
Kevin B. Spaeth (argued), Spaeth, Thelen, Dearstyne & Van Voorhis, 115 South 5th, P.O. Box 6313, Grand Forks, N.D. 58206-6313, for plaintiff and appellee.
Stout v. Stout
Civil No. 960150
Maring, Justice.
[¶1] Julene Stout appeals from the May 24, 1996, order denying her permission to move from North Dakota to Arkansas with the parties' minor child. We reverse the trial court's denial and grant Julene's request to move. We remand to the trial court to establish a reasonable visitation schedule and to enter an amended judgment in accordance herewith.
[¶2] Julene and James Stout were married in Iowa in 1983, and one child was born of the marriage, William Tell Stout (Tell), in December, 1993. James works for the U.S. Marshal service, and was transferred to Grand Forks in 1987, where the family has since lived.
[¶3] In 1995, the couple divorced, and the decree became final on February 2, 1996. Julene was awarded primary physical custody of Tell, and James was granted visitation on alternating weekends, two evenings per week, alternating holidays, Father's Day, and six weeks during the summer. James was ordered to pay $653.00 per month in child support and $500.00 per month in spousal support for four years. During the original divorce proceeding, Julene requested that she be allowed to move to Arkansas with Tell to be closer to her family and to seek employment. The court denied the move.
[¶4] Both Julene and James have their master's degrees in criminal justice. Since their marriage in 1983, Julene has not pursued a career in this field, but has followed James in pursuit of his career from Iowa to Kansas to Mississippi to North Dakota. After Tell's birth in 1993, Julene did not work outside the home, but stayed home to provide full-time care for Tell. After the couple's divorce, Julene obtained a part-time position as an office assistant in a law firm, working for $6.00 per hour with no benefits. She contends this position is soon to be eliminated.
[¶5] In March of 1996, Julene moved to change Tell's residence to Arkansas, and James resisted. At the time of this motion, Julene had been offered a full-time position in Springdale, Arkansas, at J.V. Manufacturing Company earning $8.50 per hour with full benefits. Julene presented documentation to the court to show that she has been unable to find suitable employment in North Dakota. She testified she found an apartment in Arkansas; found day-care placement for Tell; would be living in close proximity to her parents and a sister with small children; and would be only two hours from James' parents. Neither James nor Julene has any extended family in North Dakota.
[¶6] The trial court denied Julene's motion on May 24, 1996. It reasoned first, James had exercised his visitation rights and the relationship would suffer; second, the court had denied Julene's request to move at the time of the divorce; and third, the $2.50 per hour wage increase was not a "sufficient enough economic advantage to justify the separation" of Tell and James. The court noted that Julene should be able to rehabilitate herself while remaining in Grand Forks, and "[t]hat is precisely why the court ordered the combination of child support and spousal support in order to allow [Julene] to stay in this area, even if she were making a relatively low income." The court also stated that there had been no "change of circumstances" since Julene's last request to move.
[¶7] Section 14-09-07 of the North Dakota Century Code compels a custodial parent to receive judicial permission to change the residence of children to another state if the noncustodial parent does not consent to the move. The custodial parent must show that the change of residence is in the best interests of the children. Thomas v. Thomas, 446 N.W.2d 433, 434 (N.D. 1989), (citing Olson v. Olson, 361 N.W.2d 249 (N.D. 1985)). It is the principal responsibility of the trial court to decide whether a change of residence is in the best interests of the child. Thomas at 434. This court will not substitute its judgment for that of the trial court unless the trial court's decision is clearly erroneous under Rule 52(a), N.D.R.Civ.P. Thomas. A finding is clearly erroneous under Rule 52(a), N.D.R.Civ.P., only if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, on the entire evidence, we are left with a definite and firm conviction that a mistake has been made. McDonough v. Murphy, 539 N.W.2d 313, 316 (N.D. 1995).
[¶8] In the present case, after reviewing all the evidence presented, this court concludes that the trial court's decision is clearly erroneous because it was induced by an erroneous view of the law, and although there is some evidence to support it, on the entire record we are left with a definite and firm conviction that a mistake has been made. We take this opportunity to clarify the standards that apply to a petition for removal of a child to another state by the custodial parent when the noncustodial parent refuses to consent.
[¶9] It has long been the policy in this state that "the best interests of the child" is the primary consideration in determining whether or not a custodial parent may change the residence of the child. Burich v. Burich, 314 N.W.2d 82, 85 (N.D. 1981). Presently our statute regarding removal, N.D.C.C. § 14-09-07 (1991), states if the noncustodial parent who has visitation rights does not agree to the removal, the custodial parent must seek a court order. The custodial parent must prove, by a preponderance of the evidence, that the move is in the best interests of the child. Olson v. Olson, 361 N.W.2d 249, 252 (N.D. 1985). In Hedstrom v. Berg, 421 N.W.2d 488, 490 (N.D. 1988), we held that in removal cases the trial court should weigh the favorable factors of the move against the negative impact on the relationship between the child and the noncustodial parent.
[¶10] It is necessary to look at the history of N.D.C.C. § 14-09-07 to clarify our analysis and decision in this case. Prior to 1979, N.D.C.C. § 14-09-07, stated:
A parent entitled to the custody of a child has a right to change his residence, subject to the power of the district court to restrain a removal which would prejudice the rights or welfare of the child. [Emphasis added]
[¶11] In 1979, the North Dakota Legislative Assembly amended N.D.C.C. § 14-09-07, removing the language which granted the custodial parent the "right" to remove a child. 1979 N.D. Session Laws, ch. 194, § 5. The statute then read:
A parent entitled to the custody of a child shall not change the residence of the child to another state except upon order of the court or with the consent of the noncustodial parent, where the noncustodial parent has been given visitation rights by the decree, however, a court order shall not be required if the noncustodial parent has not exercised such visitation rights for a period of one year. [Emphasis added]
N.D.C.C. § 14-09-07 (1979). The legislative history indicates the statute was so amended to minimize the possibility of the custodial parent defeating the visitation rights of the noncustodial parent by moving the children out of North Dakota. See Hearing on H.B. 1585, before the Committee on Social Welfare & Veteran's Affairs, 46th Legislative Assembly (1979), (March 2, 1979, testimony of Rep. Wayne Stenehjem). The statute requires the custodial parent to obtain permission of the court before changing the residence of the child.
[¶12] In 1991, the legislature again amended section 14-09-07, N.D.C.C., 1991 N.D. Session Laws, ch. 150, § 1. The statute presently reads:
A parent entitled to the custody of a child may not change the residence of the child to another state except upon order of the court or with the consent of the noncustodial parent, if the noncustodial parent has been given visitation rights by the decree. A court order is not required if the noncustodial parent (1) has not exercised visitation rights for a period of one year or (2) has moved to another state and is more than fifty miles [80.47 kilometers] from the residence of the custodial parent. [Emphasis added]
N.D.C.C. § 14-09-07 (1991). The word "shall" was changed to "may" with regard to the custodial parent's entitlement to change the residence of the child to another state. In construing a statute, words are to be understood in their ordinary sense. N.D.C.C. § 1-02-02. Although the word "may" ordinarily is construed as permissive, we construe it as "must" in this statute, because the context compels such construction. See North Dakota Com'n on Medical Competency v. Racek, 527 N.W.2d 262, 268 (N.D. 1995). The 1991 amendments also added another exception to when a court order is required to move a child's residence out of state. 1991 N.D. Sessions Laws, ch. 150, § 1; N.D.C.C. § 14-09-07 (1991). If the noncustodial parent has moved out of North Dakota and is more than fifty miles from the custodial parent's residence, a court order is not required. Id. It is simply logical not to require the custodial parent to obtain a court order to move when the noncustodial parent has already moved out of North Dakota. During a hearing on these amendments, it was reiterated that the reason for requiring a court order or permission of the noncustodial parent before changing the residence of a child is to prevent the custodial parent from moving out of state with the intention of defeating the noncustodial parent's visitation rights. Hearing on S.B. 2270, before the Senate Judiciary Committee, 52nd Legislative Assembly (1991) (Jan. 21, 1991, statement of Senator Wayne Stenehjem). It is clear that the limited purpose of the statute is to safeguard the visitation rights of the noncustodial parent and to thereby maintain and promote the parent and child relationship.
[¶13] Nearly each of our fifty states has addressed the issue of whether a custodial parent can relocate to another state with the child either by case law and/or statute. The general trend over the last two decades has been for courts to permit removal of a child from the state if the custodial parent can demonstrate that the move is consistent with "the best interests of the child," a standard met by weighing and balancing specific factors. We hereby establish specific factors to be considered in a determination of what is in "the best interests of the child" in the context of a custodial parent's request to move the residence of a child out of North Dakota.
[¶14] In addition to North Dakota, other states have statutes specifically addressing removal of minor children from the state by the custodial parent.(1) The common thread that runs through these statutes is that any move contemplated by the custodial parent will be resolved in favor of "the best interests of the child." State courts, however, have articulated different standards by which to determine "the best interests of the child." There are several "schools of judicial thought" concerning removal of a child by a custodial parent out of state.(2)
[¶15] Of the twenty-one states other than North Dakota which have statutes dealing specifically with removal of a child from the jurisdiction, four are substantially similar to N.D.C.C. § 14-09-07. The statutes of Massachusetts, [Mass. Gen. Laws Ann. ch. 208, § 30 (1994)]; Minnesota, [Minn. Stat. Ann. § 518.175 subd. 3 (1990)]; Missouri, [Rev. Stat. Mo. § 452.377 (1994)]; and New Jersey, [N.J. Stat. Ann. § 9:2-2 (1993)] all contain language that the custodial parent "shall not" remove the child from the jurisdiction without the other parent's permission or court order. The Massachusetts statute, Mass. Gen. Laws Ann. ch. 208 § 30 (1990) and the New Jersey statute, N.J. Stat. Ann. 9:2-2 (1993), specifically allow removal only upon "cause shown." Each of these states has articulated standards for determining "the best interests of the child." Due to the similarity of the statutes of these states to the North Dakota statute, we concentrate our analysis on how these four states have interpreted their respective statutes.
[¶16] New Jersey's removal statute, N.J. Stat. Ann. 9:2-2, states, in pertinent part:
When the Superior Court has jurisdiction over the custody and maintenance of the minor children, of parents divorced, . . . they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age without the consent of both parents, unless the court, upon cause shown, shall otherwise order.
The New Jersey Superior Court had an opportunity to interpret this statute twenty years ago in the oft-cited case of D'Onofrio v. D'Onofrio, 144 N.J. Super. 200, 365 A.2d 27 (Ch. Div. 1976), aff'd Per Curiam 144 N.J. Super. 352, 365 A.2d 716 (App. Div. 1976).(3) In its decision, the Superior Court listed the following factors for courts to consider in making a determination whether to allow or prevent removal:
It should consider the prospective advantages of the move in terms of its likely capacity for improving the general quality of life for both the custodial parent and children. It must evaluate the integrity of the motives of the custodial parent in seeking the move in order to determine whether the removal is inspired primarily by the desire to defeat or frustrate visitation by the noncustodial parent, and whether the custodial parent is likely to comply with substitute visitation orders when she is no longer subject to the jurisdiction of the courts of this State. It must likewise take into account the integrity of the noncustodial parent's motives in resisting the removal and consider the extent to which, if at all, the opposition is intended to secure a financial advantage in respect of continuing support obligations. Finally, the court must be satisfied that there will be a realistic opportunity for visitation in lieu of the weekly pattern which can provide an adequate basis for preserving and fostering the parental relationship with the noncustodial parent if removal is allowed.
D'Onofrio, 365 A.2d 27 at 30. The factors articulated by the New Jersey Superior Court in D'Onofrio, have either been specifically cited with approval or essentially adopted by many state courts across the country over the last twenty years. See Pollock v. Pollock, 889 P.2d 633, 636 (Ariz.App.Div. 1 1995); Staab v. Hurst, 868 S.W.2d 517 (Ark.App. 1994); In Re Marriage of Chester, 907 P.2d 726, 730 (Colo. App. 1995); In Re Marriage of Eckert, 518 N.E.2d 1041, 1045, rev'g 499 N.E.2d 627 (Ill. 1988); In Re Quirk-Edwards, 509 N.W.2d 476, 479 (Iowa 1993); Mize v. Mize, 621 S.2d 417, 420, quashing 589 S.2d 959 (Fla.App.5 Dist. 1991); Hale v. Hale, 429 N.E.2d 340, 344 (Mass.App. 1981); Anderson v. Anderson, 427 N.W.2d 627, 628-29 (Mich.App. 1988); Auge v. Auge, 334 N.W.2d 393, 398 (Minn. 1983); Effinger v. Effinger, 913 S.W.2d 909, 912 (Mo. App. E.D. 1996); Trent v. Trent, 890 P.2d 1309, 1312-13 (Nev. 1995); Tropea v. Tropea, 665 N.E.2d 145 (N.Y. 1996), aff'g 212 A.2d 1050 (N.Y.A.D. 4 1995); Gruber v. Gruber, 583 A.2d 434, 440-41 (Pa.Super. 1990); Fortin v. Fortin, 500 N.W.2d 229, 232 (S.D. 1993); Taylor v. Taylor, 849 S.W.2d 319, 329 (Tenn. 1993); and Love v. Love, 851 P.2d 1283, 1289 (Wyo. 1993).
[¶17] The related statute in Massachusetts reads, in pertinent part, as follows:
[a] minor child of divorced parents . . . over whose custody and maintenance a probate court has jurisdiction shall not, if of suitable age to signify his consent, be removed out of this commonwealth without such consent, or, if under that age, without the consent of both parents, unless the court upon cause shown otherwise orders.
Mass. Gen. Laws Ann. ch. 208 § 30 (1994). In Hale v. Hale, 429 N.E.2d 340 (Mass. App. 1981), the Massachusetts Appeals Court reversed a trial court's decision denying the custodial mother permission to take the parties' three children to California. In its decision, the court stated: "[t]he best interests of children for purposes of deciding whether to permit removal are also interwoven with the well being of the custodial parent, and the determination, therefore, requires that the interests of the mother also be taken into account." Hale at 342.
[¶18] In a recent article referencing the research of noted psychologist Dr. Judith S. Wallerstein,(4) the inextricable link between the welfare of the custodial parent and the child is addressed.(5) The article "To Move or Not to Move . . .,"(6) states:
When parents consider divorce, they inevitably confront the question of whether they should stay together in the marriage for the sake of the children. If they divorce, it may be presumed that they have decided it is more important to part and re-establish separate, more fulfilling lives. By proceeding in this fashion, they effectively establish, with or without legal consent, a new kind of family unit in which the child resides. Within that unit, when the parents opt for sole custody and visitation, the child looks primarily to the custodial or caretaking parent, and secondarily to the visiting parent, for nurturance, protection, and guidance.
Court intervention designed to maintain the geographical proximity of divorced parents is fundamentally at odds with a divorce decision that necessarily determines that each parent will rebuild his or her life separate from the other. To require divorcing parents to spend their lives in the same geographical vicinity is unrealistic. The state cannot legitimately confine individuals to a particular location in their quest for love or the good things in life. Forcing divorced parents to remain in the same place may undermine the divorce decision and threaten the child with continued instability throughout his or her childhood.
Prohibiting a move by the custodial parent may force that parent to choose between custody of his or her child and opportunities that may benefit the family unit, including the child as well as the parent. These may include a new marriage, an important job opportunity, or a return to the help provided by an extended family in the rearing of the child by a single parent. Imposing this choice can be severely detrimental to the psychological and economic well-being of the parent over many years. It also has the potential for burdening the parent-child relationship for many years, regardless of the choice the parent makes.
Judith S. Wallerstein and Tony J. Tanke, To Move or Not to Move: Psychological and Legal Considerations in the Relocation of Children Following Divorce, Fam.L.Q., Vol. 30 No. 2, Pg. 305, 314-15 (Summer 1996)(footnotes omitted).
[¶19] The third state with a removal statute similar to N.D.C.C. § 14-09-07 is Missouri. Rev. Stat. Mo. § 452.377 (1994) states:
A person entitled to the custody of a child shall not change the residence of the child to another state or remove the child from this state for a period of time exceeding ninety days except upon order of the court or with the written consent of the parties with custody or visitation rights.
The appellate courts of Missouri have had several opportunities to examine this statute. See Fuchs v. Fuchs, 887 S.W.2d 414 (Mo.App.S.D. 1994); Riley v. Riley, 904 S.W.2d 272 (Mo.App.E.D. 1995); Stewart v. Stewart, 905 S.W.2d 114 (Mo.App.W.D. 1995); Effinger v. Effinger, 913 S.W.2d 909 (Mo.App.E.D. 1996). The Missouri Courts of Appeals have enumerated four factors to consider in removal questions. These factors are essentially identical to those outlined in D'Onofrio, supra, and read as follows:
In determining the propriety of the custodial parent's relocation to another jurisdiction, courts consider the following factors:
1. The prospective advantages of the move in improving the custodial parent's and child's quality of life.
2. The integrity of the custodial parent's motives for relocation.
3. The integrity of the non-custodial parent's motives for opposing the move, particularly the extent such opposition is intended to secure a financial advantage with respect to continuing child support.
4. Whether there is a realistic opportunity for visitation which can provide an adequate basis for preserving and fostering the non-custodial parent's relationship with the child if relocation is allowed.
In Effinger, 913 S.W.2d 909, 912 (Mo.App.E.D. 1996) the Missouri appellate court takes care to clarify that "[e]ach case involving the relocation of children must be resolved on the particular facts of the case rather than by rigid application of rules, and the best interests of the child always remain the paramount concern." Effinger, 913 S.W.2d at 912 (citation omitted).
[¶20] Minnesota has taken a different approach in interpreting its statute regarding removal. Section 518.175, subd. 3, Minn. Stat. Ann. reads as follows:
The custodial parent shall not move the residence of the child to another state except upon order of the court or with the consent of the noncustodial parent, when the noncustodial parent has been given visitation rights by the decree. If the purpose of the move is to interfere with visitation rights given to the noncustodial parent by the decree, the court shall not permit the child's residence to be moved to another state.
The first sentence of the Minnesota statute is essentially identical to the first sentence of the North Dakota statute. However, in Auge v. Auge, 334 N.W.2d 393 (Minn. 1983), the Minnesota Supreme Court established a presumption favoring removal by a custodial parent and stated such requests "shall be granted unless the party opposing the motion establishes by a preponderance of the evidence that the move is not in the best interests of the child." Auge, 334 N.W.2d at 399. This decision shifts the burden to the noncustodial parent to prove that removal would not be in the best interests of the child. Our court specifically rejected this presumption in Olson v. Olson, 361 N.W.2d 249, 251-52 (N.D. 1985).
[¶21] In summary, our research of other jurisdictions has failed to reveal a universally accepted approach to resolving the question of when a custodial parent may relocate, but some guiding principles emerge from several well reasoned cases. D'Onofrio v. D'Onofrio, 144 N.J. Super. 200, 365 A.2d 27 (Ch. Div. 1976), aff'd Per Curiam 144 N.J. Super. 352, 365 A.2d 716 (App.Div. 1976); Hale v. Hale, 429 N.E.2d 340 (Mass.App. 1981); Effinger v. Effinger, 913 S.W.2d 909 (Mo.App.E.D. 1996).
[¶22] The next step in our analysis is to review the cases in which this court has construed the North Dakota removal statute. We held in Burich v. Burich, 314 N.W.2d 82 (N.D. 1981) we will not require "exceptional circumstances" to be established before a custodial parent can be granted permission to move a child out of state. Id. at 84. Our court in Burich, also established that the test for removal was whether the move was in the best interests of the child. Id.
[¶23] In Olson v. Olson, 361 N.W.2d 249 (N.D. 1985), this court held that there was no presumption that the custodial parent's decision to leave the state is in the best interests of the child. This court also established the custodial parent has the burden of proof that a move is in the best interests of the child when the noncustodial parent has exercised visitation.
[¶24] In McRae v. Carbno, 404 N.W.2d 508 (N.D. 1987) the majority of this court reiterated that the test for allowing removal was whether the move was in the best interests of the child. However, in denying a motion to relocate, our court in McRae, placed great importance on the relationship between the noncustodial parent and the child, and the noncustodial parent's right of visitation. Id.
[¶25] In Hedstrom v. Berg, 421 N.W.2d 488 (N.D. 1988) we established that economic advantages of a move were factors to be considered and that the trial court should balance the move out of state with the negative impact on the relationship between the noncustodial parent and the child. This court pointed out that a modified visitation schedule providing for longer periods of continuous visitation could be used in the balancing of these different interests.
[¶26] In Novak v. Novak, 441 N.W.2d 656 (N.D. 1989), this court recognized that increased career opportunities for the custodial parent or a step-parent in another state, a well adjusted child, preference of the child and a suitable modified visitation schedule were all factors to be considered in determining the best interests of the child.
[¶27] In Thomas v. Thomas, 446 N.W.2d 433 (N.D. 1989) we again rejected the proposal that a showing of "exceptional circumstances" is necessary to change the residence of a child. We recognized that interference with visitation rights is a factor to be considered in the best interests of the child in the context of removal.
[¶28] Our review of these cases indicates that until now, our court has articulated a standard for resolving relocation issues which, simply stated, is "the best interests of the child." While we do not dispute that achieving "the best interests of the child" remains the ultimate objective in resolving relocation issues, we believe that the standard must be given more specific and instructive content in order to provide our trial courts with adequate guidance and to provide more uniform dispute resolution.
[¶29] We begin with the recognition that divorce causes significant changes in parent-child relationships. In perhaps the leading case in relocation disputes, the New Jersey court discusses these issues:
Even under the best of circumstances and where the custodial parent is supportive of a continuing relationship between the child and the noncustodial parent, the nature of a parental relationship sustainable by way of visitation is necessarily and inevitably of a different character than that which is possible where the parents and children reside together as a single-family unit. The fact remains that ordinarily the day-to-day routine of the children, especially young ones, and the quality of their environment and their general style of life are that which are provided by the custodial parent and which are, indeed, the custodial parent's obligation to provide. The children, after the parents' divorce or separation, belong to a different family unit than they did when the parents lived together. The new family unit consists only of the children and the custodial parent, and what is advantageous to that unit as a whole, to each of its members individually and to the way they relate to each other and function together is obviously in the best interests of the children. It is in the context of what is best for that family unit that the precise nature and terms of visitation and changes in visitation by the noncustodial parent must be considered.
D'Onofrio, 365 A.2d 27 at 29-30. The court in D'Onofrio, specifically recognized the importance of developing and maintaining a relationship between the noncustodial parent and the child and the importance of visitation. D'Onofrio, 365 A.2d at 30. Indeed, this court is fully cognizant of the interests of both the noncustodial parent and the child in maintaining a healthy and loving relationship. Our court has stated: "In North Dakota, visitation privileges are created to promote the best interests of the child." Burich, 314 N.W.2d at 86; see also McRae, 404 N.W.2d at 509.
[¶30] In weighing the effect relocation has on visitation rights, we recognized:
If the court refuses to grant permission for the children to leave the state and the custodial parent leaves, the roles are reversed, but the problem is the same: The move has interfered with or restricted the ability of one parent to exercise visitation rights.
Thomas, 446 N.W.2d at 435 (quoting the trial court).
[¶31] Although recent studies have not specifically addressed the issue of relocation, they have addressed post-divorce parent-child relationships and the complex issues that relocation creates. See Fam.L.Q. Vol. 30 No. 2, pg. 305, 311-12 (Summer 1996). In discussing Dr. Judith Wallerstein's research, the article "To Move or Not to Move . . ." states:
In their attempts to justify changes in custody in relocation cases, judges have sometimes applied a seemingly irrebuttable presumption that frequent and continuing access to both parents lies at the core of the child's best interests. Therefore, it is important to state very clearly that the cumulative body of social science research on custody does not support this presumption. While the psychological adjustment of the custodial parent has consistently been found to be related to the child's adjustment, that of the noncustodial parent has not. Neither is the amount of visiting of the noncustodial parent consistently related to the child's adjustment.[Emphasis in original]
There is no evidence in Dr. Wallerstein's work of many years, including the ten and fifteen year longitudinal study, or in that of any other research, that frequency of visiting or amount of time spent with the noncustodial parent over the child's growing-up years is significantly related to good outcome in the child or the adolescent. [Footnote omitted] The research of Professor Frank Furstenberg has yielded similar findings, showing no connection between the frequency of noncustodial visits and good outcome. [Footnote omitted]
Fam.L.Q. Vol. 30 No. 2, pg. 305, 311-12, (Summer 1996). Thus, we conclude from Dr. Wallerstein's data and from this court's decision in Thomas, supra, that the noncustodial parent's right to maintain and develop a relationship with the child can be satisfied by modification of the visitation schedule to include less frequent but more extended periods of time.
[¶32] In every relocation dispute, the court must try to accommodate the competing interests of the custodial parent who desires to seek a better life for herself and the children in a different geographical area; the child's interest in maintaining a meaningful relationship with the noncustodial parent; the noncustodial parent's interest in maintaining a meaningful relationship with the child; and finally, the state's interest in protecting the best interests of the child.
[¶33] Keeping in mind these interests and based on our careful examination of this court's prior cases, leading cases from other jurisdictions, recent literature concerning children of divorce, and recognition that our society is highly mobile, we fashion a standard by which our trial courts can resolve relocation disputes.
[¶34] First, the burden of proof is on the custodial parent to show that the removal of the child from the state of North Dakota is consistent with the best interests of the child. We do not overrule any of our prior case law in this regard. We do not hereby endorse the view that a request to leave the jurisdiction should presumptively be approved, nor do we subscribe to a presumption against the right to remove a minor child. Rather, we require the trial courts of this state, when considering requests to move a child out of North Dakota, to apply the following four-factor analysis to the facts of each case with the primary concern being the best interests of the child:
1. The prospective advantages of the move in improving the custodial parent's and child's quality of life,
2. The integrity of the custodial parent's motive for relocation, considering whether it is to defeat or deter visitation by the noncustodial parent,
3. The integrity of the noncustodial parent's motives for opposing the move,
4. Whether there is a realistic opportunity for visitation which can provide an adequate basis for preserving and fostering the noncustodial parent's relationship with the child if relocation is allowed, and the likelihood that each parent will comply with such alternate visitation.
In considering the prospective advantages to the move, a court shall not limit itself solely to enhanced economic opportunities for the custodial parent, but must also assess other less tangible benefits of the relocation. For example, the reason for relocation may be a desire to be close to a supportive extended family, to pursue educational opportunities, or seek an improved physical and emotional environment in which to raise the child. These examples are not intended to be exhaustive, but we emphasize that the trial court must consider non-economic advantages which are likely to improve the child's and custodial parent's general quality of life. We recognize that the improvement of the general quality of life for the custodial parent ordinarily will indirectly benefit the child.
[¶35] Secondly, the trial court must satisfy itself that the motion to relocate is not motivated simply by a desire to defeat the visitation rights of the noncustodial parent or to hamper the opportunity of the noncustodial parent to maintain a relationship with the child. The court should determine the degree to which the custodial parent will comply with visitation arrangements after the move.
[¶36] Third, the court must consider the motives of the noncustodial parent in opposing the move and determine whether the opposition is based on a legitimate desire to maintain the parent-child relationship, or whether other motives are at work.
[¶37] Finally, the trial court must determine whether a visitation schedule can be devised which can reasonably provide the foundation for maintaining and developing a parent-child relationship between the child and the noncustodial parent. We agree with the New Jersey court in D'Onofrio, supra, which stated:
The court should not insist that the advantages of the move be sacrificed and the opportunity for a better life and more comfortable lifestyle for the mother and children be forfeited solely to maintain weekly visitation by the father where reasonable alternative visitation is available and where the advantages of the move are substantial.
D'Onofrio, 365 A.2d at 30. We reiterate that a move sought in good faith and to gain legitimate advantages for the custodial parent and the child must not be denied simply because visitation cannot continue in the existing pattern. See, e.g., D'Onofrio, 365 A.2d at 29; Auge v. Auge, 334 N.W.2d 393, 397 (Minn. 1983); Effinger v. Effinger, 913 S.W.2d 909, 913 (Mo.App.E.D. 1996). The trial court must weigh and balance these factors based on the facts of each case. No one factor is to be dominant and a factor that has minor impact in one case may be the dominant factor in another.
[¶38] We begin our analysis of Julene's request to move to Arkansas with Tell by applying the first factor articulated above -- the prospective advantages of the move in improving the custodial parent's and child's quality of life.
[¶39] Neither James nor Julene has any family in North Dakota. If allowed to move to Arkansas, Julene would be within fifty miles of her parents and a sister, as well as a two-hour drive from James' parents. In the original divorce proceeding, the trial court incorporated by reference the partial transcript of proceedings of the original hearing into its December 6, 1995, Memorandum Decision and Order. In that transcript, the trial court specifically noted, "[t]here is an advantage on the other hand to having your family close and your support system. I don't deny that it's an advantage." The trial court clearly found it would be an advantage to Julene and Tell to have extended family close by.
[¶40] At the time of the original divorce proceeding, Julene was not employed. She requested she be permitted to move back to Arkansas with Tell, and the trial court denied her request. As a reason for the denial at that time, the court stated, "I don't see any great economic benefit of the move. Mrs. Stout has indicated that she plans to have a home business of some type, I believe, and that she can probably do that same business here in North Dakota that she can in Arkansas." At the time of the hearing on Julene's removal motion Julene was employed as an office assistant by a law firm working part time at $6.00 per hour, with no benefits, such as health insurance, paid holidays, or sick leave. An affidavit from the firm's managing partner states that Julene's position will be eliminated soon, due to the downsizing of the firm. At the time of the hearing, Julene had been offered a full-time position with J.V. Manufacturing in Springdale, Arkansas. Julene supplied documentation that the position paid $8.50 per hour, offered health insurance, paid holidays, sick leave, profit sharing and retirement plans.
[¶41] In its order dated December 6, 1995, the trial court noted:
[Julene] is economically disadvantaged by reason of the divorce. Even though she has a master's degree, she was not employed at the time of the divorce hearing in August, 1995. She has not worked in the field of criminal justice and it will take a considerable length of time before she is able to rehabilitate her earning capacity to approximate that of [James]. Indeed, it is unlikely that she will ever do so. [Julene] has devoted the majority of her time to raising [Tell] since his birth and she has followed [James] in his career from place to place rather than developing her own career.
[¶42] In its May 24, 1996, Memorandum Decision and Order, the trial court stated:
[Julene] proposes that she move to Arkansas in order to accept a job that pays $8.50 per hour. She is currently employed at $6.00 per hour. In its Memorandum Decision of December 6, 1995, the Court indicated that the amount of child support and spousal support combined should be sufficient to care for [Julene's] reasonable and necessary expenses, assuming that she can earn, at least, the minimum wage during the time that she is being rehabilitated. [Julene] is making more than the minimum wage in her current employment.
The trial court went on to state, "the additional $2.50 per hour is not a sufficient advantage to justify the separation [of Tell and James]. . . . That is precisely why the Court ordered the combination of child support and spousal support in order to allow [Julene] to stay in this area, even if she were making a relatively low income."
[¶43] The trial court used rehabilitative spousal support not to attempt to restore the economically disadvantaged spouse to independent status, but primarily to keep Julene in the state of North Dakota for that period it felt was necessary to establish the parent-child relationship between James and Tell. The theory of rehabilitative support is to allow the disadvantaged spouse to meet financial needs while becoming self-sufficient. See Fenske v. Fenske, 542 N.W.2d 98, 103 (N.D. 1996), (citing Rustand v. Rustand, 379 N.W.2d 806 (N.D. 1986)). The trial court's emphasis in its decision, however, was not on enabling Julene to reach financial independence. The court's statement in its Memorandum Decision and Order of May 24, 1996, regarding its award of spousal support "[t]hat is precisely why the court ordered the combination of child support and spousal support in order to allow [Julene] to stay in this area, even if she were making a relatively low income" is directly contrary to the intent of rehabilitative spousal support -- assisting the disadvantaged spouse in becoming financially independent.
[¶44] The advantages that Julene would gain if allowed to move to Arkansas do not merely include a $2.50 raise. The benefits of working at a job with benefits such as health insurance, paid vacation, sick leave, and retirement plus future opportunities to advance are substantial to Julene. The trial court cannot ignore or discount completely these benefits which will significantly improve the quality of life for Julene and, ultimately, Tell. This court considers the child's best interests inextricably interwoven with the quality of life of the custodial parent, with whom the child lives and upon whom the child relies emotionally. The issue is not whether the custodial parent can find a minimum wage job in North Dakota. Quality of life includes such things as health and happiness, not just financial stability.
[¶45] We believe the trial court erred in its analysis of the economic and non-economic advantages of the proposed move. The court failed to consider the benefits a network of close family members would provide and other non-economic advantages.
[¶46] We now turn our attention to the second factor, the integrity of Julene's motive to relocate. In the original divorce proceeding, Julene expressed a desire to return to Arkansas to be near her family and pursue her career. She has made her wishes known throughout these proceedings, and there is no evidence that she made this decision on a "whim", or that her motives were to deny James' visitation.
[¶47] In contemplation of the move, Julene made living arrangements for herself and Tell in Springdale and obtained day care placement for Tell. Julene took all reasonable steps to arrange a comfortable and stable life for herself and Tell if the move were permitted. She did not attempt to "sneak off" to Arkansas, but has made her wishes known throughout these proceedings, and has done everything necessary to facilitate a smooth transition to a full life in Arkansas. The record reflects that James has exercised his visitation rights and that Julene has been fully cooperative therein. Julene has not denied James visitation and, in fact, has permitted him additional visitation with Tell upon request and mutual agreement. There is no evidence that she would not cooperate with the visitation schedule should she move to Arkansas with Tell.
[¶48] We next turn to the integrity of James' motives in resisting the move. We find nothing in the record which leads us to believe that James was motivated by anything other than concern for his relationship with his son. We reiterate this court's recognition of the importance of maintaining a relationship between the noncustodial parent and the child, but also recognize that it is unrealistic to expect that relationship to be the same after divorce.
[¶49] We finally turn our analysis to the opportunities for an alternate visitation schedule and the likelihood that each parent will comply with such alternate visitation. As previously noted, James has been very active in exercising his court-appointed visitation with Tell. He has seen the child several times each week for a few hours at a time. There have been a few occasions when James has asked for extra time with Tell, and Julene has generally agreed. During the time Julene and James have been separated, she has encouraged a relationship between James and Tell. After denying Julene's initial request to move, the trial court specifically stated, "I'm not afraid that Mrs. Stout would not follow the court order. I think she would follow court orders. . . ."
[¶50] Julene investigated transportation between Grand Forks and Springdale before she made her motion for removal. She offered to share the expenses of Tell's transportation on a 50/50 basis.
[¶51] Based on the trial court's statement indicating the belief that the parties would continue to cooperate, and the parties' past cooperation, we determine that there exist opportunities for substitute visitation arrangements and that each party will likely comply with such alternate visitation.
[¶52] We agree with the statement made by the Missouri Court of Appeals for the Eastern District: "[e]ach case involving the relocation of children must be resolved on the particular facts of the case rather than by rigid application of rules, and the best interests of the child always remain the paramount concern. Where all or most of the above factors weigh in favor of the custodial parent, the trial court's refusal to allow the custodial parent to move constitutes reversible error. On the other hand, where the factors favor neither parent, or favor the noncustodial parent, the trial court's denial of the custodial parent's request to move will be affirmed (citations omitted)." Effinger, supra, at 912. In the present case, the factors clearly weigh in favor of Julene.
[¶53] We note even though the trial court did not apply the factors enunciated today, this court would reach the same decision if we apply the "best interests" factors of N.D.C.C. § 14-09-06.2 to the record of this case. Based on our careful review of the record, we are persuaded that the trial court erred in denying relocation.
[¶54] We emphasize that motions to relocate are not motions for change of custody. The factors to be considered in motions to change custody are enumerated in N.D.C.C. § 14-09-06.2. In contrast, in a motion to relocate, the primary physical custody decision has already been made, and custody is not the issue.(7) If the noncustodial parent brings a motion for change of custody in response to a motion to relocate, the noncustodial parent must first prove there has been a significant change in circumstances and second, the change compels, in the best interests of the child, a change of custody. McDonough v. Murphy, 539 N.W.2d 313, 316 (N.D. 1995). Relocation of the minor child is not in and of itself a significant change in circumstances. Id. at 317. To the extent that the trial court applied the "change in circumstances" test to the facts of this case, it misapplied the law.
[¶55] The judgment of the lower court is hereby REVERSED and the case is REMANDED to the trial court to establish an appropriate visitation schedule based on the move of the child and to enter an amended judgment in accordance herewith.
[¶56]
Mary Muehlen Maring
Herbert L. Meschke
Gerald W. VandeWalle, C.J.
Neumann, Justice
, concurring and dissenting.
[¶57] I agree with the majority that the goal of achieving the best interests of the child in relocation cases must be given more specific and instructive content to guide trial courts and afford more uniform dispute resolution. I believe the standard articulated by the majority is an important first step in providing that content.
[¶58] I, however, cannot agree that the trial court's findings are clearly erroneous under the vague, undifferentiated best interests standard. I would therefore remand for the trial court to reconsider the motion in light of the more specific standard articulated in the majority's opinion.
[¶59]
William A. Neumann
Sandstrom, Justice
, dissenting.
[¶60] Because the trial court correctly applied the long-standing law of this state, I would affirm.
[¶61] The majority asserts, at ¶8, the trial court's decision "was induced by an erroneous view of the law," and proceeds to pronounce as the law of this state principles repeatedly rejected by this Court--principles contrary to express legislative intent.
[¶62] The long-established law of this state has been:
"In matters pertaining to custody and visitation rights, we are concerned primarily with the best interests of the children and not the wishes or desires of either parent."
Muraskin v. Muraskin, 336 N.W.2d 332, 336 (N.D. 1983) (citing Burich v. Burich, 314 N.W.2d 82 (N.D. 1981)).
"Minor children are entitled to the love and companionship of both parents insofar as this is possible and consistent with their welfare.
"For this reason, visitation privileges granted to the non-custodial parent must not be viewed merely as a privilege of that parent, but as a right of the child which is not to be subverted by the custodian."
Gardebring v. Rizzo, 269 N.W.2d 104, 110 (N.D. 1978) (internal quotation marks and citations omitted).
[¶63] Long after these principles were announced, the legislature amended the law to better protect the interests of the child to have regular and frequent visitation with the non-custodial parent. According to the Minutes of the Senate Committee on Social Welfare and Veterans Affairs, March 2, 1979, Senator Stenehjem testified the provisions of House Bill 1585, amending N.D.C.C. § 14-09-07, dealt with actions of custodial parents which defeat visitation:
"For instance, mother moved to Florida, father remains in North Dakota--his rights still remain same seeing child every two weeks but almost impossible since she moved to Florida. What they did was defeat the order of the court."
Yet, here the majority substitutes the happiness and comfort of the custodial parent as a primary factor in deciding whether the custodial parent should be permitted to move the child.
[¶64] The majority, starting at ¶33, purports to "fashion a standard" allegedly consistent with the prior decisions of this Court. In fact, the standard enunciated by the majority reflects the dissenting positions specifically rejected by this Court in McRae v. Carbno, 404 N.W.2d 508, 509-511 (N.D. 1987):
"[The custodial parent] invites us to overrule our decision in Olson v. Olson, 361 N.W.2d 249 (N.D. 1985), in which we concluded that in this state there is not a presumption in favor of the custodial parent's decision to change the child's residence. We decline the invitation. In Olson, supra, we concluded that a presumption in favor of the custodial parent's decision to change the child's residence would be inconsistent with our state law. We reiterate and reaffirm our position on this issue as stated in Olson, supra, 361 N.W.2d at 252:
"'We believe the . . . presumption is inconsistent with [Section 14-09-07]. . . . At least in cases such as this where the noncustodial parent has been given and has exercised visitation rights, the custodial parent has the burden of securing an order for a change of residence of the child to another state by demonstrating that it is in the best interests of the child to do so. See, Burich v. Burich, 314 N.W.2d 82 (N.D. 1981). In our state, there is a legally recognizable right of visitation between a child and the noncustodial parent which is considered to be in the best interests of the child. See Subsection 14-05-22(2), N.D.C.C.; Gardebring v. Rizzo, 269 N.W.2d 104 (N.D. 1978).
"'The statutory recognition of visitation rights between a child and the noncustodial parent is consistent with placing the burden upon the custodial parent to show that moving the child to another state is in the child's best interest. We conclude that there is no presumption that a custodial parent's decision to change the child's residence to another state is in the child's best interests. We are unpersuaded that it would be consistent with our statutes or otherwise appropriate to adopt such a presumption, and we refuse to do so.
"The dissenting justices accord far less importance to the relationship of noncustodial parent and child than the trial court and would permit a move that concededly has a negative impact on that relationship so long as the custodial parent articulates 'legitimate reasons' for the move. We do not believe that the legislature enacted Section 14-09-07, N.D.C.C., with the intent of accomplishing little more than placing a ministerial responsibility upon the courts in signing change of residence orders for the asking. That is the ultimate consequence of the dissenting justices' interpretation of the provision for it would be seldom, indeed, that a custodial parent could not articulate anticipated or hoped-for advantages at the location of the desired move.
"Being a good parent is very difficult. Being a good parent in a noncustodial role, with the parent/child contact severely limited by court decree, is extremely difficult. The legislature and the past decisions of this court have placed a high level of importance on the rights of children to have the love and companionship of both parents. Any act which will interfere with that relationship should be closely scrutinized. Justice Levine suggests in her dissent that '[i]ndeed, vindictiveness should be the primary, if not exclusive, target of the statute.' That is simply contrary to our caselaw which sets forth the best interests of the child, not the motive of the custodial parent, as the primary issue in deciding whether or not a change in residence of the child should be permitted. The trial court must be given substantial discretion in deciding whether to approve such a move, which might for all practical purposes severely distort or perhaps eliminate the parent/child nature of the relationship between the child and the noncustodial parent.
"In many cases the determination of custody is an extremely close decision, and the determination that the best interests of the child will be served by placing the child in the custody of one parent takes into consideration the liberal visitation rights granted to the other parent. In some cases a trial court might very well have placed the child in the other parent's custody if, at the time of awarding custody, the court had known that the proposed custodial parent planned to move from the state.
"Justice Meschke, in his dissent, points out that this is not a custody case and that the factors set forth in Section 14-09-06.2, N.D.C.C., cannot be used to determine the best interests of the child. It is axiomatic that the issue of child custody and visitation are interrelated. In Burich v. Burich, 314 N.W.2d 82 (N.D. 1981), a case involving visitation and not a change of custody, Chief Justice Erickstad, writing for a unanimous court, said:
"'In determining the best interests of a child, the trial court must consider the factors listed in Section 14-09-06.2, N.D.C.C. We believe that the factors impliedly recognize a child's need for a meaningful relationship with both his mother and his father. That need is met not only by daily contact with the custodial parent, but also by meaningful visitations with the noncustodial parent." 314 N.W.2d at 87.
"Justice Meschke also states in his dissent that 'change of residence does not itself change the right of visitation in any way that the parties or the court cannot amply adjust.' That position is contrary to the very reason for the enactment of Section 14-09-07, N.D.C.C. To imply that there will be no adverse effect on the relationship between the noncustodial parent and the child as a result of the child moving more than 1,000 miles away is to overlook the realities of life. As Justice Levine concedes in the opening line of her dissent, '[i]t goes without saying that any change of residence will "negatively impact" a father-child relationship where that father is a loving and attentive noncustodial parent.'
"The trial court has heard the testimony and observed the parties involved. It has determined that [the custodial parent] has not met her burden of proof in establishing that the best interests of [the child] will be served by granting her permission to move to Seattle. The decision of the trial court should be upheld unless we are convinced that a mistake has been made. We are not so convinced, and, accordingly, the order of the trial court is affirmed."
[¶65] The legislature and this Court have recognized the importance to the child of regular visitation:
"Children are entitled to the love and companionship of both parents, and regularly scheduled visitation is an integral part of developing a healthy relationship between a child and the non-custodial parent."
Iverson v. Iverson, 535 N.W.2d 739, 742 (N.D. 1995) (citing Gardebring). Yet, the majority apparently supplants the child's interest in the love and companionship of both parents with the happiness of the custodial parent, writing at ¶44:
"This court considers the child's best interests inextricably interwoven with the quality of life of the custodial parent, with whom the child lives and upon whom the child relies emotionally. The issue is not whether the custodial parent can find a minimum wage job in North Dakota. Quality of life includes such things as health and happiness, not just financial stability."
Is it sufficient if the custodial parent's "happiness" would be promoted by being done with the ex-spouse and dealing with visitation?
[¶66] In its analysis of the "best interests of the custodial parent," the majority invades the province of the trial courts in order to "find facts." In doing so, it dons the hat of advocacy, ignoring that the new job is not in the custodial parent's career field, ignoring the suspect credibility of an affidavit from her attorney/employer that her job is to be ended, and ignoring the loss of proximity to the child's next closest relative (his father) to be closer to more distant relatives.
[¶67] The majority "finds" the custodial parent's motives in making the move to be "pure" while ignoring the previous pronouncements of this Court that the ability to articulate a non-vindictive motive for the move is not our standard. See, e.g., McRae at 510 ("for it would be seldom, indeed, that a custodial parent could not articulate anticipated or hoped-for advantages at the location of the desired move").
[¶68] The majority "finds" less frequent visitation by the non-custodial parent to be sufficient, despite our contrary holdings. See, e.g., McRae ("The legislature and the past decisions of this court have placed a high level of importance on the rights of children to have the love and companionship of both parents").
[¶69] I would reject the action of the majority reversing the previous decisions of this court and nullifying the intent of the legislature, and would affirm the well-reasoned decision of the trial court.
[¶70]
Dale V. Sandstrom
Footnotes:
1. Arizona, [Ariz. Rev. Stat. § 25-408(C)(1) (1996 Supp.)]; California, [Cal.[Fam.] Code § 3024(2)(1994)]; Georgia, [Ga. Code Ann. § 19-9-1(c)(1),(3) (1996 Supp.)]; Illinois, [750 Ill. Comp. Stat. 5/609(a)(b) (1993)]; Indiana, [Ind. Code § 31-1-11.5-21.1(b) (1993)]; Kansas, [Kan. Stat. Ann. § 60-1620 (1996 Supp.)]; Massachusetts, [Mass. Gen. Laws Ann. ch. 208 § 30 (1994)]; Minnesota, [Minn. Stat. Ann. § 518.175 subd. 3 (1990)]; Missouri, [Rev. Stat. Mo. § 452.377 (1994)]; Montana, [Mont. Code Ann. § 40-6-231 (1995)]; Nevada, [Nev. Rev. Stat. § 125A.350 (1995)]; New Jersey, [N.J. Stat. Ann. 9:2-2 (1993)]; New Mexico, [N.M. Stat. Ann. § 40-4-9.1 (1994)]; North Carolina, [N.C. Gen. Stat. § 50-13.2(c) (1995)]; Oklahoma, [Okla. Stat. tit. 10, § 19 (1987)]; Oregon,[Or. Rev. Stat. tit. 11, § 107.159 (1995)]; South Dakota, [S.D. Codified Laws § 25-5-13 (1992)]; Texas, [Tex. [Fam.] Code Ann. § 151.003(a)(1) (1996)]; Utah, [Utah Code Ann. § 30-3-37(1) (1995)]; Virginia, [Va. Code Ann. § 20-124.5 (1995)]; and Wisconsin, [Wis. Stat. § 767.327 (1996 Supp.)]. 2. For a summary of these "schools of judicial thought," see39 S.D. Law Review 661, 674 (1994). 3. The New Jersey Supreme Court approved the intermediate appellate court's decision in D'Onofrio, but held that a custodial parent who wanted to move had to show a "real advantage" to the move. Cooper v. Cooper, 491 A.2d 606 (N.J. 1984). The New Jersey Supreme Court subsequently modified that test by holding any sincere, good faith reason will suffice. Holder v. Polanski, 544 A.2d 852, 856 (N.J. 1988). 4. Judith S. Wallerstein, Ph.D., founded the Center for the Family in Transition in Marin County, California, in 1980 and served as its executive director from 1980 until 1993. She has conducted widely published long-term studies on the effects of divorce on children and adolescents. 5. We note that some commentators disagree that a child's best interests are served when the best interests of the custodial parent are served. See Russenberger v. Russenberger, 654 S.2d 207, 213 n.6 (Fla.App.1 Dist. 1995). 6. This article was adapted from an amica curiae brief filed by Mr. Tony J. Tanke on behalf of Dr. Wallerstein in the California Supreme Court case In Re Marriage of Burgess, 913 P.2d 473 (Cal. 1996), rev'g 897 P.2d 1320 (1995). 7. We recognize that there are cases in which the parents, pursuant to a final decree, share physical custody equally and an original determination of primary custody may be necessary in a motion to relocate by one parent.