1998 ND 179

**Karen Jean KELLER, Plaintiff and Appellant,**

v.

**Michael Edward KELLER, Defendant and Appellee.**

**Civil No. 980068.**

Supreme Court of North Dakota.

Sept. 29, 1998.

Arnold V. Fleck, of Wheeler Wolf, Bismarck, and Roger C. Malm (on brief), Brink, Sobolik, Severson, Malm & Albrecht, P.A., Hallock, for plaintiff and appellant.

Michael E. Keller, pro se, Larimore.

VANDE WALLE, Chief Justice.

[¶ 1] Karen Keller appealed from a district court order denying her request to move with her daughter, Elizabeth (Beth) Keller to Fort Wayne, Indiana. We hold the district court's finding the move is not in Beth's best interests is clearly erroneous, and we reverse and remand with instructions the court enter an order permitting the move and establishing an appropriate visitation schedule for Beth and her father, Michael Keller.

[¶ 2] Michael and Karen were married in 1982. At the time of the marriage they were both students at the University of North Dakota in Grand Forks. Michael completed his studies for a law degree, and in 1984 the family moved to Grafton where Michael prac-

ticed his profession. Beth was born in January 1984 and Karen assumed the duties of a housewife and mother. She also completed her undergraduate studies in psychology and gave piano lessons.

[¶ 3] The parties separated in July 1991. Michael remained in Grafton, but Karen and Beth moved to East Grand Forks to live with Karen's parents, Bob and Dorothy Pribula. In January 1992, Karen received her master's degree in counseling and guidance and obtained employment at Friendship Place, with a beginning salary of about $19,000. She became the director of the center and was earning about $28,000 per year when she resigned in the summer of 1996.

[¶ 4] Michael and Karen were divorced in September 1992. Karen received physical custody of Beth with liberal visitation for Michael, including visits every other weekend, alternating specified holidays, and five weeks each summer.

[¶ 5] In June 1993, Karen gave birth to another daughter, Megan Keller, whose biological father is Greg Carlson. Megan is not the subject of these proceedings. However, Beth and Megan have resided together for most of the time since Megan was born. The parties understand Carlson will agree to have Megan remain in Karen's custody and reside with her and Beth either in or out-of-state depending on the outcome of this case.

[¶ 6] While living with her parents in East Grand Forks, Karen began studies in March 1994 with the Union Institute in Cincinnati, Ohio to earn a doctoral degree of philosophy in clinical psychology. This was a non-traditional program which allowed Karen to work toward her degree while continuing to live and work in East Grand Forks. However, she was required to attend three, five-day seminars at the Cincinnati campus. She also was required to complete a one-year internship. In August 1996, Karen secured an internship at Fort Wayne, Indiana, and she went there leaving the girls in the care of her parents in East Grand Forks. During the internship, Karen maintained frequent contact with the girls by letter and telephone. During these times Michael exercised his liberal visitation rights with Beth.

[¶ 7] Karen testified she planned to return to Grand Forks after earning her doctoral degree and find a job in the area. However, in April 1997 the catastrophic Grand Forks—East Grand Forks flood occurred. Karen's parents lost their home, which was located near the Red River, and almost everything in it. The stresses from the flood caused Dorothy Pribula to become very ill and she was hospitalized. Bob Pribula suffered a stroke, which resulted in his placement in a nursing home where he still resides.

[¶ 8] The consequences of this series of events was that the grandparents and the girls were displaced from their home, and the grandparents were no longer able to assist with their care. Karen took an emergency leave of absence and came back to Grand Forks. In deciding what to do next, Karen conferred with Dr. Ken Carlson, a psychologist in the Grand Forks area and a colleague of Karen serving on Karen's doctoral degree committee. She also conferred with Dr. Chuck Barke, the chairperson of the Counseling and Psychology Department at the University of North Dakota. Both told Karen there was chaos in the Grand Forks area resulting from the flood and there were no job possibilities there. Consequently, Karen decided to return to Fort Wayne with both daughters on May 2, 1997.

[¶ 9] Michael was hesitant about Beth leaving because of the resulting interference with his visitation rights. Karen agreed Beth would come back for a summer visit in June 1997. On July 19, 1997 Karen brought Beth and Megan back with her to Fort Wayne. The girls adjusted very quickly to the move. Beth visited a parochial school, attended by the daughter of one of Karen's associates in Fort Wayne, and registered to attend school there. She attended the school for about 17 days, until Karen realized she must send her back to North Dakota or face contempt charges for violating the custody judgment. Megan returned to East Grand Forks to reside with her grandmother, Dorothy Pribula, who had sufficiently recuperated to again assist with her care, and Beth returned to reside with Karen's brother and family. Karen then filed this motion requesting per-

mission to move with Beth to Fort Wayne. After a hearing, the court denied the motion.

[¶ 10] A custodial parent must get judicial permission to move with her child to another state if the non-custodial parent does not consent to the move. N.D.C.C. § 14-09-07. The *custodial parent has the burden of proving the move from the state is in the best interests of the child. Paulson v. Bauske*, 1998 ND 17, ¶ 6, 574 N.W.2d 801. The trial court's decision whether to allow the removal of a child from this state is a finding of fact and will not be reversed on appeal unless it is clearly erroneous under N.D.R.Civ.P. 52(a). *Id.* A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, on the entire evidence, we are left with a definite and firm conviction that a mistake has been made. *Sumra v. Sumra*, 1997 ND 62, ¶ 8, 561 N.W.2d 290.

[¶ 11] In considering a request to move a child from North Dakota, the primary concern is the best interests of the child and the court must apply a four-factor analysis to the facts of the case:

1. The prospective advantages of the move in improving the custodial parent's and child's quality of life,

2. The integrity of the custodial parent's motive for relocation, considering whether it is to defeat or deter visitation by the noncustodial parent,

3. The integrity of the noncustodial parent's motives for opposing the move,

4. Whether there is a realistic opportunity for visitation which can provide an adequate basis for preserving and fostering the noncustodial parent's relationship with the child if relocation is allowed, and the likelihood that each parent will comply with such alternate visitation.

*Stout v. Stout*, 1997 ND 61, ¶ 34, 560 N.W.2d 903.

[¶ 12] The trial court applied these four factors in resolving Karen's motion to move Beth out-of-state. The court determined factors two and three were not dispositive because neither parent lacked integrity or valid purpose in that parent's position regarding the move. The court found Karen's desire to move was not for the purpose of defeating or deterring Michael's visitation with Beth but to enhance and improve her and Beth's lives. The court also found Michael's motive in objecting to the move was for the valid purpose of preserving his visitation rights with Beth.

[¶ 13] In denying the move, the court found factors one and four to be dispositive. The court found Karen failed to substantiate an economic advantage for the move. The court also found that, even though the court could make adjustments to the visitation schedule to accommodate the move, regular personal contact between Michael and Beth would be in Beth's best interests. For those reasons, the court denied the motion. We conclude the district court's findings with regard to factors one and four are clearly erroneous in several respects.

[¶ 14] Karen presented considerable evidence showing economic and non-economic advantages resulting from her and Beth's move to Fort Wayne. Upon completing her doctorate degree, Karen obtained a position in a Fort Wayne clinic with excellent salary and benefits which were recognized by the trial court in its findings:

The final package was salaried at $36,800 with benefits including health, dental and optometric insurance. Her working hours are 8 a.m. to 4 p.m., Monday through Friday. She must work under supervision for one year after which she must take the test for licensing. If she completes these requirements and becomes licensed, she will receive a 14% pay increase. She said that the opportunities were better for a licensed psychologist. If she is able get into the field of industrial psychology, she can earn between $300,000 and $400,000 annually in Fort Wayne.

Nevertheless, the district court found Karen failed to substantiate the economic advantage of the move to Fort Wayne, because she did not attempt to apply for interviews for employment in Grand Forks or the surrounding area. We believe the court gave far too little

consideration to the evidence presented by Karen on this issue.

[¶ 15] There was evidence it would be difficult or impossible for Karen to obtain a license to practice psychology in North Dakota because the Cincinnati school was not A.P.A. certified. The school's accreditation provided no problems for licensing in Indiana but did present substantial problems for getting a license in North Dakota. The divorce decree stated Karen could move with Beth anywhere within a 125 mile radius of Grand Forks without obtaining approval. However, Karen testified about 20% of her efforts to find a job were directed toward Grand Forks and the surrounding area and she was unable to find any comparable position to the one she has in Fort Wayne. Furthermore, her mentors, doctors Carlson and Barke, highly regarded professionals with long-standing in the Grand Forks community, advised her there were no job opportunities in the area comparable to the opportunities existing in Fort Wayne. Karen testified there are currently no jobs in the local area for unlicensed clinical psychologists. She further testified that denial of the move would "create quite a hardship on me" because the Indiana job offers her financial independence which is not currently available in her profession in the Grand Forks area. Michael introduced only vague evidence to directly contradict this specific evidence. We are left with a definite and firm conviction the trial court mistakenly found Karen failed to substantiate economic advantage by the move.

[¶ 16] We also conclude the trial court's finding visitation could not be restructured, if the move were allowed, to provide for Beth's best interests is clearly erroneous. Even though a move may add cost and distance to visitations making it impossible to continue the frequency of visits between the non-custodial parent and child, the relationship between the non-custodial parent and child can be preserved by a restructured visitation schedule. *Paulson*, 1998 ND 17, ¶ 15, 574 N.W.2d 801. If this were not recognized, the fourth factor would be an unintentional automatic reason to deny relocation. A visitation schedule which provides less frequent, but extended, visitation periods will preserve a non-custodial parent's right to foster and develop a relationship with the child. *Matter of B.E.M.*, 1997 ND 134, ¶ 20, 566 N.W.2d 414. By allowing liberal visitation during the summer months and vacations the court can restructure the visitation schedule to foster a meaningful relationship between Michael and Beth. *See Burich v. Burich*, 314 N.W.2d 82, 88 (N.D.1981).

[¶ 17] At the time of the proceedings, Beth was a 14 year-old eighth grader. The trial court found Beth is a "well-adjusted child" and an "A" student. Beth testified she very much wants to reside with her mother in Indiana. Beth was very impressed with the private school there and the manner in which she was accepted by the teachers and her peers.

[¶ 18] The preference of the child is one factor the trial court may consider in determining the best interests of the child in the context of a motion to remove the child from the state. *Sumra v. Sumra*, 1997 ND 62, ¶ 14, 561 N.W.2d 290. *See also Novak v. Novak*, 441 N.W.2d 656, 658 (N.D.1989). The preference of a mature child, such as Beth, is particularly significant in determining the child's best interests. *Gietzen v. Gietzen*, 1998 ND 70, ¶ 10, 575 N.W.2d 924.

[¶ 19] Prior to her last return from Fort Wayne to North Dakota, Beth was a straight A student actively involved in extra-curricular activities such as track, volleyball, and piano. Since her move back to North Dakota, Beth's grades have slipped and she is not nearly as interested in participating in extra-curricular activities. Beth unconditionally stated her preference is to live in Indiana with her mother. Unfortunately, the trial court neither indicated it gave any consideration to Beth's preference nor explained why it should discount or ignore it. *Novak*, 441 N.W.2d at 658 (VandeWalle, J., concurring specially) (expressing concern that insufficient consideration given to child's preference).

[¶ 20] Having carefully reviewed the record, we conclude the trial court's denial of Karen's request to move with Beth to Fort Wayne because it would not be in Beth's best interests is clearly erroneous. We, there-

fore, reverse the order of the district court and remand with instructions the court enter an order granting the motion to move and establishing an appropriate visitation schedule for Michael and Beth.

[¶ 21] Reversed and remanded.

[¶ 22] MESCHKE, MARING and NEUMANN, JJ., concur.

SANDSTROM, Justice, dissenting.

[¶ 23] Because the trial court carefully, fairly, and properly followed the law and found the facts, I dissent from the majority's reversal.

[¶ 24] The trial court carefully followed the majority's four-part analysis in *Stout v. Stout*, 1997 ND 61, 560 N.W.2d 903. The majority reweighs the evidence, saying, at ¶ 14, "We believe the court gave far too little consideration to the evidence presented by Karen on this issue." The majority does this despite our doctrine, "We do not reweigh the evidence." *See Wolf v. Estate of Seright*, 1997 ND 240, 573 N.W.2d 161, 166 (N.D. 1997); *Wagner v. Sheridan Co. Soc. Services Bd.*, 518 N.W.2d 724, 728 n. 4 (N.D.1994); *Habeck v. MacDonald*, 520 N.W.2d 808, 813 (N.D.1994); *Bismarck Public School Dist. 1 v. State*, 511 N.W.2d 247, 261 (N.D.1994); *Spangler v. North Dakota Workers Comp. Bureau*, 519 N.W.2d 576, 580 (N.D.1994); and *State v. Pacheco*, 506 N.W.2d 408, 410 (N.D.1993). Here, the majority's analysis ignores the specific finding by the trial court and arbitrarily re-finds the facts to achieve the pre-ordained result. For example, the majority omits the following from the trial court's order:

> She presented no evidence as to whether she would have problems obtaining licensure in Minnesota, her state of residency. Mike presented copies of employment advertisements from the Grand Forks Herald. Karen stated that the positions would require licensure or were below her educational level. One ad for the Northeast Human Service Center listed a salary range which is comparable to her position in Fort Wayne, but she stated that she and the Northeast personnel would not get along since she was instrumental in reduc-

ing that Center's funding from the state legislature. Mike inquired whether she made any applications for positions in communities within a 125 mile radius of Grand Forks as permitted under the decree. These would include North Dakota communities such as Fargo, Jamestown, and Devils Lake and Crookston and Moorhead, Minnesota. Karen testified that she had not made any applications within that radius. In response to a MeritCare ad in Fargo, she stated that it would likely require a license, however the ad did not state that a license is required. Karen devoted 80% of her efforts in finding employment to Indiana and 20% to North Dakota.

[¶ 25] If one were inclined to retry, one could as easily reverse the trial court's finding on the motivation of the custodial mother, in view of her repeated efforts to violate and deny the father's rights under the divorce decree, and her job-seeking efforts focusing far from the father. But the road to retrial in these cases is a one-way street.

[¶ 26] The extended families live near the father. In *Stout* at ¶¶ 38–39 and 45, the majority thought the proximity of the extended family was a very important consideration:

> We begin our analysis of Julene's request to move to Arkansas with Tell by applying the first factor articulated above—the prospective advantages of the move in improving the custodial parent's and child's quality of life.

> Neither James nor Julene has any family in North Dakota. If allowed to move to Arkansas, Julene would be within fifty miles of her parents and a sister, as well as a two-hour drive from James' parents. In the original divorce proceeding, the trial court incorporated by reference the partial transcript of proceedings of the original hearing into its December 6, 1995, Memorandum Decision and Order. In that transcript, the trial court specifically noted, '[t]here is an advantage on the other hand to having your family close and your support system. I don't deny that it's an advantage.' The trial court clearly found

it would be an advantage to Julene and Tell to have extended family close by.

\*     \*     \*     \*     \*     \*

The court failed to consider the benefits a network of close family members would provide and other non-economic advantages.

Under the majority view, however, the proximity of the extended family is apparently important only if it is to be in proximity of the custodial mother. *See Paulson v. Bauske,* 1998 ND 17, 574 N.W.2d 801.

[¶ 27] Sadly, the majority continues its inexorable drive to substitute completely "the happiness of the custodial mother" for the "best interests of the child." *Id.* at ¶ 27.

[¶ 28] I would affirm the decision of the trial court.

[¶ 29] Dale V. Sandstrom