1999 ND 73

**STATE of North Dakota, County of Cass, ex rel. Kelly A. MELLING, and Tyler Christian Ness, a minor child, Plaintiffs and Appellees**

v.

**Jeff Paul NESS, Defendant and Appellant**

No. 980074.

Supreme Court of North Dakota.

April 27, 1999.

Kelly A. Melling, pro se, Largo, FL. Submitted on brief.

Alisha L. Ankers, Fargo, ND, for defendant and appellant.

NEUMANN, Justice.

[¶ 1] Jeff Ness appealed from an amended judgment denying his request for a change of custody of his son, Tyler Christian Ness, from the child's mother, Kelly Melling, and granting Melling's request to move with Tyler to Florida. We conclude the referee's findings, confirmed by the trial court, that it would be in Tyler's best interests to be allowed to leave North Dakota and reside with Melling in Florida, and that there was no significant change in circumstances warrant-

ing a change of custody, are not clearly erroneous. We therefore affirm.

## I

[¶ 2] Tyler was born out-of-wedlock on May 27, 1989, after Melling and Ness ended their relationship. The couple never lived together or married. Tyler has resided with Melling in West Fargo since his birth, and Ness, who resides in Fargo, has visited with the child on a regular basis. A judicial determination of Tyler's paternity was not entered until September 1996, after Melling became married for a second time. The paternity judgment granted Melling and Ness "joint legal custody" of Tyler, awarding Melling physical custody and Ness liberal visitation. Ness was ordered to pay $275 per month in child support and to maintain medical insurance for Tyler. The parties were required to split Tyler's other medical expenses. Melling's second marriage ended in divorce in 1997. Ness has never been married.

[¶ 3] In August 1997, Ness learned Melling and her boyfriend intended to move with Tyler to Florida. Ness moved for an order changing physical custody and prohibiting Melling from moving to Florida with Tyler. Melling responded with a motion to hold Ness in contempt and restrain him from coming onto her property except during visitation. Melling also sought permission from the court to relocate to the Largo, Florida area with Tyler, and moved to increase Ness's child support obligation and to require Ness to pay certain medical expenses.

[¶ 4] The court appointed a guardian ad litem who prepared a custody study and recommended Tyler remain in Melling's custody and Melling be allowed to move to Florida. The matter was referred to a judicial referee who found it was in Tyler's best interests to move with Melling to Florida, provided Ness be allowed reasonable visitation. The referee found there had not been a significant change in circumstances warranting a change of custody and it would not be in Tyler's best interests for his care, custody and control to be changed to Ness. The referee further found, because of Ness's "admitted act of domestic violence" against Melling in the past, "Ness is precluded from obtaining custody of Tyler." The referee also increased Ness's child support obligation to $330 per month and ordered he reimburse Melling for Tyler's past medical expenses he failed to pay.

[¶ 5] Ness requested judicial review of the referee's decision, arguing several of the referee's findings were clearly erroneous. Ness failed to provide the trial court with a transcript of the hearing held before the referee. The court confirmed the referee's findings and conclusions based on the record it had before it. An amended paternity judgment was entered, and Ness appealed to this Court. Melling moved to dismiss the appeal or, in the alternative, summarily affirm the trial court's ruling because Ness had failed to provide the trial court with a transcript for review. We denied that motion, but after the transcript had been prepared for this appeal, we temporarily remanded the case to the trial court for a review, under N.D. Sup.Ct. Admin. R. 13, of the transcript and record. Upon further review, the trial court vacated its earlier confirmation order and confirmed all of the referee's findings and conclusions except one. The court reversed, as erroneous as a matter of law, the referee's finding Ness committed an act of domestic violence which effectively precluded him from obtaining custody of Tyler.

## II

[¶ 6] When a trial court reviews a judicial referee's decision on the record, the court examines the referee's findings of fact under the clearly erroneous standard of N.D.R.Civ.P. 52(a). *Benson v. Benson*, 495 N.W.2d 72, 77 (N.D.1993). If the trial court confirms or accepts the referee's findings of fact, we likewise review the referee's findings under the clearly erroneous standard. *See Mehl v. Mehl*, 545 N.W.2d 777, 780 (N.D. 1996). On appeal, Ness argues the referee and trial court erred in allowing Melling to move to Florida with Tyler and in failing to grant his motion for change of custody based on a significant change of circumstances.

## A

[¶ 7] A custodial parent must get judicial permission to move with her child to

another state if the noncustodial parent does not consent to the move. N.D.C.C. § 14–09–07; *Keller v. Keller*, 1998 ND 179, ¶ 10, 584 N.W.2d 509. The purpose of N.D.C.C. § 14–09–07 is to protect the noncustodial parent's visitation rights if the custodial parent wants to move out of state. *Hanson v. Hanson*, 1997 ND 151, ¶ 10, 567 N.W.2d 216. The custodial parent has the burden of proving the move is in the best interests of the child. *Paulson v. Bauske*, 1998 ND 17, ¶ 6, 574 N.W.2d 801. A trial court's decision to allow the removal of a child from this state is a finding of fact that we will not reverse on appeal unless clearly erroneous. *Matter of B.E.M.*, 1997 ND 134, ¶ 9, 566 N.W.2d 414. A finding of fact is clearly erroneous only if it is induced by an erroneous view of the law, if no evidence exists to support it, or if, upon review of the entire evidence, we are left with a definite and firm conviction that a mistake has been made. *Sumra v. Sumra*, 1997 ND 62, ¶ 8, 561 N.W.2d 290.

▮▮▮▮ [¶ 8] When determining whether the move is in the child's best interests, the court must apply a four-factor analysis enunciated in *Stout v. Stout*, 1997 ND 61, ¶ 34, 560 N.W.2d 903, and *Hawkinson v. Hawkinson*, 1999 ND 58, ¶¶ 6, 9:

1. The prospective advantages of the move in improving the custodial parent's and child's quality of life,

2. The integrity of the custodial parent's motive for relocation, considering whether it is to defeat or deter visitation by the noncustodial parent,

3. The integrity of the noncustodial parent's motives for opposing the move,

4. The potential negative impact on the relationship between the noncustodial parent and the child, including whether there is a realistic opportunity for visitation which can provide an adequate basis for preserving and fostering the noncustodial parent's relationship with the child if relocation is allowed, and the likelihood that each parent will comply with such alternate visitation.

No one factor dominates, and a factor that has minor impact in one case may be the dominant factor in another. *Stout*, 1997 ND 61, ¶ 37, 560 N.W.2d 903. The court must balance the prospective advantages of the proposed move in improving the custodial parent's and the child's quality of life with the potential negative impact on the relationship between the noncustodial parent and the child. *Hawkinson*, 1999 ND 58, ¶ 8, 591 N.W.2d 144.

1

▮▮▮▮▮ [¶ 9] The referee found there were "significant advantages" for Melling and Tyler in their prospective move to Florida. Prospective advantages for a move are not limited to enhanced economic opportunities for the custodial parent. *See Stout*, 1997 ND 61, ¶ 34, 560 N.W.2d 903. Melling suffers from Raynaud's phenomenon, osteoarthritis and lupus, which make it difficult for her to function when exposed to cold. North Dakota's cold winters cause her great discomfort and significantly affect her ability to use her fingers. Melling's physicians recommended she should move to a warmer climate because of the severity of her condition. One of Melling's physicians pointed out "[m]edical treatment for Raynaud's phenomenon is frequently only partially effective and avoiding the stimulus[,] i.e. cold exposure[,] is the best therapy if it is at all possible." A move which benefits the health and well-being of a custodial parent is certainly beneficial to the parent's child, and is consequently in the child's best interests. *See Stout*, 1997 ND 61, ¶ 17, 560 N.W.2d 903. The referee specifically noted Melling would be "able to better manage her medical problems and she will be physically more able to interact and be outside with her son."

[¶ 10] The referee also found there would be enhanced economic opportunities for Melling if she moved to Florida. Melling was employed for several years in the Fargo area in sales and management for telecommunications companies. Melling's last employer in the Fargo area was U.S. Link from which she resigned in August 1997 in anticipation of the move to Florida. She earned $34,000 per year selling long distance products and communications ideas, and managing other employees. Melling received a telecommunications job offer to start working on October 1, 1997 at LDDS WorldCom in Tampa, Florida

as an account executive with a guaranteed starting salary of $36,000 per year. According to Melling, after her first month on the job, she would receive additional commissions which could increase her earnings to $80,000 per year, and eventually to $150,000 per year. Melling owned a home in West Fargo, but it was substantially damaged in the 1997 flood and she lost more than $60,000 in personal property. She no longer wants to live in the home and has made arrangements to rent it to others for additional income. Melling has also made arrangements to rent a comfortable home less than two blocks from a new school Tyler would be attending in Largo, Florida. Although Melling's prospective job was in Tampa, she would be allowed to work out of her home in Largo and would be available to spend more time with Tyler when he was home.

[¶ 11] Ness contends the referee's finding Melling had "secured" a job in Florida is clearly erroneous because a job offer is not the equivalent of securing employment. Because employment actually remained a possibility only, Ness contends Melling failed to establish the proposed move would result in a financial advantage for her and Tyler. We have not required a custodial parent to be actually employed and working in the new community in order to prevail in a change of residence case. *See, e.g., Paulson,* 1998 ND 17, ¶¶ 5, 13, 574 N.W.2d 801 (holding permission to move should have been granted where custodial parent had "firm job offer" in the new community). Requiring the custodial parent to be actually employed in the new community poses obvious difficulties when a court has not granted the custodial parent permission to move with the child in the first place. Here, Melling actively pursued work and received a firm job offer to work in the area of the proposed move. Merely because she had not yet accepted the job offer does not lessen the relevancy of the offer in assessing economic advantage. We believe Melling's evidence of a job offer was sufficient to show the move would be financially advantageous to her and Tyler.

[¶ 12] We conclude the referee's finding the proposed move would be advantageous

and improve Melling's and Tyler's quality of life is not clearly erroneous.

## 2

[¶ 13] The referee found there was "no question about the integrity of [Melling's] motives for relocation." Ness argues Melling denied him visitation during the period between an ex parte order in this case and the hearing, and this should adversely reflect on the integrity of her motives for the move.

[¶ 14] As the trial court noted in its confirmation order, these parties had for some time agreed on their own to modifications of the formal visitation schedule, and it was only after Melling proposed to move that frustration of visitation became an issue between them. There is substantial evidence showing Melling has been flexible about visitation and had voluntarily agreed, before any court intervention, to Ness having visitation with Tyler on a regular basis which allowed him to establish a father-son relationship. Before the paternity judgment was entered formally establishing a visitation schedule, Melling allowed Ness holiday visitations so Tyler could participate in the traditions of both families. Although the extended families of both parents reside in North Dakota and Minnesota, and Melling's move to Florida will reduce contact between Tyler and those families, this fact is not alone sufficient to deny permission to relocate. *See Hawkinson,* 1999 ND 58, ¶ 15, 591 N.W.2d 144. *See also Keller,* 1998 ND 179, 584 N.W.2d 509; *Paulson,* 1998 ND 17, 574 N.W.2d 801.

[¶ 15] Melling's health would be improved by the move to Florida. She also has been offered a lucrative job in her telecommunications field. She suffered severe financial and personal losses from the 1997 flood which caused her to no longer want to live in her West Fargo home. We see nothing in the record suggesting Melling's move to Florida was intended to thwart Ness's visitation efforts and destroy his relationship with Tyler.

[¶ 16] We conclude the referee's finding there were no improper motives behind Melling's wanting to relocate with Tyler to Florida is not clearly erroneous.

[¶ 17] The referee noted Ness's opposition to the move "is based mainly on his inability to access Tyler anytime he wants," but found his "motives must also be questioned" because of Ness's continuing complaints about Melling's boyfriend.

[¶ 18] At the time of the hearing in this case, Ness was 33, Melling was 39, and Melling's boyfriend was 26. In an affidavit early in these proceedings, Ness alleged Melling met her boyfriend on the Internet and he moved into her home only two months after her divorce was final. Ness claimed he did not want his son living with a "total stranger." However, there is evidence Melling met her boyfriend through professional work contacts. After Melling's divorce, they pursued a romantic relationship.

[¶ 19] Ness also tried to characterize Melling's boyfriend as a "drug trafficker." Melling's boyfriend was charged in Florida with possessing marijuana. However, as the guardian ad litem and referee noted, Melling's boyfriend accepted a parcel for a friend which, unknown to him, contained the contraband. The local prosecutor agreed to allow him to enter into a pretrial diversion program, which he successfully completed early without any indications he used drugs or had a drug problem. The fact finder could properly view this evidence as not being indicative of bad character which would adversely affect Tyler. *See Gould v. Miller,* 488 N.W.2d 42, 44 (N.D.1992).

[¶ 20] The referee noted Ness had the opportunity to call Melling's boyfriend as a witness at the hearing, but he did not do so. The referee found Ness's "real complaints" about Melling's boyfriend are "he is years younger than [Melling] and ... he works at having a relationship with Tyler." A reasonable inference could be drawn from this evidence about the integrity of Ness's motive in opposing Melling's move.

[¶ 21] We conclude the finding that improper motives underlie Ness's opposition to Melling's move to Florida with Tyler is not clearly erroneous.

[¶ 22] The referee recognized Ness's previous visitation schedule of every other weekend, with occasional midweek visitation, could no longer be maintained, and implicitly found this would have a potential negative impact on Ness's relationship with Tyler. The referee also found, however, by providing extended visitations at Easter, Thanksgiving and Christmas, six weeks during the summer, and unlimited visitation if Ness visits in Florida, "there is a realistic opportunity for visitation which provides an adequate basis for preserving and fostering [Ness's] relationship with Tyler." The parties were ordered to split transportation costs to facilitate visitation, and the referee found, because Melling always encouraged the relationship between Ness and Tyler, "there is no reason to believe that she will not allow all the ordered visitation if she is allowed to move with Tyler." Ness asserts these findings are also clearly erroneous.

[¶ 23] Although Florida is a long distance from North Dakota, we said in *Sumra,* 1997 ND 62, ¶ 17, 561 N.W.2d 290, modern transportation has allowed the measure of distance to be done in hours rather than days, and instant communication is available through phone links between a parent and child who live far apart. The extended periods of visitation will allow Ness and Tyler longer periods together during which they can nurture the parent-child relationship. We are not convinced Ness will suffer a financial hardship by being required to pay his share of the visitation costs. Moreover, as we noted earlier, there is evidence Melling always encouraged visitation between Ness and Tyler, which supports the referee's finding Melling would likely comply with the visitation order.

[¶ 24] We conclude the referee's findings extended visitation could be structured to preserve and foster Ness's relationship with Tyler, and Melling would likely comply with the alternative visitation, are not clearly erroneous.

[¶ 25] Having reviewed the record, we further conclude the referee weighed and balanced the appropriate factors and his finding any detrimental effect to Ness's relationship

with Tyler was outweighed by the advantages to Melling and Tyler in moving to Florida is not clearly erroneous.

## B

[¶ 26] Ness contends the referee erred in finding there was no significant change in circumstances warranting a change of custody.

[¶ 27] In determining if a change of custody is necessary, a court must consider whether there is a significant change of circumstances since the original custody decree, and if so, whether this change compels the court to change custody to serve the best interests of the child. *Hagel v. Hagel*, 512 N.W.2d 465, 467 (N.D.1994). When there are competing motions for change of custody and change of residence, if the trial court grants the motion to remove the child from the state, the motion for change of custody is effectively denied, provided the only basis for the motion was the planned move, because the best interests of the child have already been considered in the context of the move. *B.E.M.*, 1997 ND 134, ¶ 12, 566 N.W.2d 414. Here, most of the evidence relied on by Ness to support the change of custody was related to Melling's proposed move to Florida. That evidence cannot support Ness's attempt to have custody changed.

[¶ 28] Ness argues other evidence shows there is a significant change of circumstances which compel a change of custody to serve Tyler's best interests. Ness contends there is instability of the custodial home because Melling was recently divorced and is now living with her new boyfriend. Ness is also concerned that Tyler suffers from separation anxiety disorder and attention deficit disorder and these disorders have occurred while Tyler has been in Melling's custody.

[¶ 29] Substantial evidence supports the referee's finding there was no significant change of circumstances compelling a change of custody to serve Tyler's best interests. The evidence shows Melling has been the primary caretaker in Tyler's life, and she actively encouraged Ness to form a father-son relationship with Tyler. The referee found Melling has provided a stable and sat-isfactory environment for Tyler, has acquired proper medical attention for his disorders, and has done an "excellent job" raising Tyler. The referee found Melling's relationships have not negatively affected Tyler in any way, and Tyler has developed "a very strong bond with his mother and ... is dependent on her." The referee found Tyler's "ties with his mother are closer than those with his father," and Melling "has proved her capacity and disposition to provide love, affection, and educational guidance to Tyler."

[¶ 30] On the other hand, the referee termed Ness's contributions to Tyler as being "quite limited." Ness failed to provide court ordered medical insurance for Tyler for several months and was "inappropriate in his parenting on several occasions." The referee found:

> [Ness's] involvement with his son has been limited to mostly weekend visitations. [Ness] has been involved in at least one serious relationship and has chosen not to involve Tyler with that person. [Ness] has never taken Tyler for any extended visitation and has been only peripherally involved in Tyler's life. [Ness] has not provided much beyond the weekend visitation to his son.

[¶ 31] Having reviewed the record, we conclude the referee's finding there was no significant change of circumstances compelling a change of custody to serve Tyler's best interests is not clearly erroneous.

## III

[¶ 32] We conclude the referee's challenged findings are not clearly erroneous, and the trial court did not err in confirming them. The amended judgment is affirmed.

[¶ 33] VANDE WALLE, C.J., MARING and KAPSNER, JJ., concur.

SANDSTROM, Justice, concurring in the result.

[¶ 34] I have previously expressed my disagreement with *Stout v. Stout*, 1997 ND 61, ¶¶ 60–69, 560 N.W.2d 903 (Sandstrom, J., dissenting).

[¶ 35] Some might interpret the majority opinion to condone imputing improper mo-

tives to the non-custodial parent merely because the non-custodial parent objects to immoral or unsafe activity in the custodial parent's home. That is not my understanding of the majority's intent.

[¶ 36] I concur in the result.

[¶ 37] Dale V. Sandstrom